UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RALPH SCOTT,

       Petitioner,

 -vs-          **No. 05-CV-0857(VEB)**
             **DECISION AND ORDER**

ROBERT DENNISON, Chairman,
New York State, Division of Parole;
JAMES CONWAY, Superintendent,
Attica Corr. Fac.,

       Respondents.
_____

**I.  Factual Background and Procedural History**

   Ralph Scott ("Scott" or "petitioner") has filed a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 alleging that he is being held in state custody in violation of his

federal constitutional rights. The parties have consented to disposition of this matter by a

magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

   Scott's detention in state custody arises from judgments of conviction entered on July 25,

1977, in New York County Supreme Court, convicting him of two counts of Murder in the

Second Degree (New York Penal Law ("Penal Law") § 125.25(3)), and four counts of Robbery

in the First Degree (Penal Law § 160.15); on May 12, 1978, in Bronx County Supreme Court,

convicting him of Attempted Criminal Possession of a Weapon in the Third Degree (Penal Law

§§ 110.00/265.02); and on October 18, 1978, in Westchester Supreme Court, convicting him of

Attempted Escape in the First Degree (Penal Law §§ 110.00/205.15).

   On April 12, 1976, petitioner and three cohorts, all armed, entered the New Amsterdam

Theater at 214 West 42nd Street in New York City, to execute a pre-arranged plan to rob the theater employees and the payroll. Petitioner was familiar with the theater because, prior to that date, he had worked at the theater as a "Security Officer - Sergeant." *See* Respondent's Exhibit T, Petitioner's Resume, p. 3.

Petitioner and his cohorts first seized one of the security guards, bound him, and put him in the ladies' lounge. *See* Respondent's Exhibit D, p. 2. As employees began to arrive at the theater, they were directed into the lounge by petitioner and his accomplices. *Id.* When the manager arrived, petitioner and his co-perpetrators stole the manager's revolver. In addition, they stole a security guard's handgun and a watch from an employee. *Id.*

An armored payroll car arrived eventually arrived, with two security guards in attendance. By that point, about twenty theater patrons were being imprisoned in the ladies' lounge. When Scott aimed his sawed-off shotgun at one armored car guard, the other guard turned and ran out of the theater. As the second guard fled, Scott fatally shot him in the back. *Id.* Scott and one of his cohorts then disarmed the other guard and pushed him to the floor, and petitioner fatally shot him. *Id.*

Two of the perpetrators surrendered to the police. Scott, however, remained at large. About a month later, on May 11, 1976, at about 11:00 a.m., Bronx County police officers conducting were on a rooftop conducting surveillance when they spotted petitioner on an adjacent rooftop. *Id.*, p. 2. The officers, believing that petitioner resembled an individual who had robbed a milk truck ten minutes earlier, entered petitioner's rooftop and ordered him to stop. *Id.* When Scott turned to face the police officers, his jacket blew open, revealing a gun in a shoulder holster. *Id.* The officers placed Scott under arrest.

After Scott was arrested, the milk truck driver stated that Scott was not the individual who had robbed him. *Id.* Scott remained in custody on criminal possession of a weapon charges and also was charged with the murders and robberies that he had committed a month earlier at the New Amsterdam theater.

A New York County Grand Jury returned an indictment charging petitioner with two counts of second-degree murder, three counts of first-degree robbery, and one count of attempted first-degree robbery in connection with the theater crimes. Following a jury trial, Scott was convicted as charged on July 25, 1977. In addition, a Bronx County Grand Jury charged Scott with attempted third-degree weapon possession for the rooftop incident. On May 12, 1978, Scott pleaded guilty to this crime, in exchange for an indeterminate term of imprisonment of from 1½ to 3 years.

Prior to that guilty plea on the weapons possession charge, while Scott was incarcerated at Sing Sing Correctional Facility, he made an attempted escape: Corrections officers observed him filing through a window bar in a room located in the Administration Building on March 29, 1978. Examination revealed that the window bar was severed half-way. *Id.* Petitioner was charged with and, on October 18, 1978, pleaded guilty to, attempted first degree escape in Westchester County Supreme Court.

With respect to the murder and robbery convictions, Scott was sentenced to indeterminate prison terms of from 25 years to life on each murder count and from 5 to 15 years on each robbery count, to be served concurrently with each other but consecutively to parole time owed by petitioner. Scott was sentenced, as a second felony offender, *see* Penal Law § 70.06, to a indeterminate term of from 1½ to 3 years for the attempted third-degree weapon possession

charge. He was sentenced to an indeterminate term of from 1½ to 3 years imprisonment for the attempted first-degree escape conviction, to run concurrently "with any undischarged term [petitioner] is now serving." Although Scott's New York and Bronx County convictions were affirmed by the Appellate Division, First Department, that court modified one of the first-degree robbery counts by reducing it to attempted first-degree robbery. *People v. Scott*, 93 A.D.2d 754, 462 N.Y.S.2d 309 (App. Div. 1st Dept. 1983). Leave to appeal to the New York State Court of Appeals was denied. *People v. Scott*, 61 N.Y.2d 678 (N.Y. 1983). Scott is currently incarcerated at Attica State Correctional Facility pursuant to these judgments of conviction.

On each occasion that Scott has appeared before the New York State Division of Parole ("the Parole Board"), he has been denied conditional release. The Parole Board's denials from 2001, 2003, and 2005 form the gravamen of Scott's habeas claims, as detailed further in the following paragraphs.

During his March 13, 2001, parole hearing, Scott was asked why he killed the two men during the theater incident. Scott replied "[t]hat was an accident, but it doesn't make any difference."  The parole commissioner pressed Scott about how the shootings happened:

> Q.:     What happened that led to that, though?
> A.:     The guy grabbed it and it went off.
> Q.:     Grabbed what, you had a shotgun?
> A.:     Yeah, he grabbed it.

Respondent's Exhibit E, p. 4.

Scott told the Board that he had graduated from college, worked in the law library and volunteered for programs, and Commissioner Smith noted petitioner's favorable disciplinary record. *Id.*, p. 7. Petitioner was informed that the Board would consider not only petitioner's

crimes, but his involvement in prison activities, his certificates and his evaluations. *Id.*, p. 6. Commissioner Smith inquired into petitioner's employment prospects upon release and asked petitioner's views on trends within the prison community. *Id.*, pp. 7-9. Commissioner Smith noted the severity of petitioner's crimes and the fact that they had been committed while he was on parole. (Petitioner had been adjudicated a youthful offender in 1961, convicted of misdemeanors, received a probation sentence, and was sentenced in 1967 to 7½ to 15 years imprisonment for second-degree robbery. *Id.*, p. 9.) Scott acknowledged his criminal record; when asked why he continued to commit crime after serving time on the second-degree robbery conviction, he responded, "I don't know, I just went off the deep end." *Id.*, pp. 9-10.

In a decision dated March 19, 2001, the Parole Board denied release to parole supervision:

> Parole denied. After a personal interview, record review, and deliberation, this panel finds your release is incompatible with the public safety and welfare. Your instant offenses of murder 2nd, robbery 1st and attempted CPW 3rd involved an in-concert, armed robbery where two security guards were shot and killed. A separate arrest led to the weapon charge above. At the time of these crimes, you were on parole. Once sentenced, you attempted to escape from Sing Sing prison. Consideration has been given to your program completion. However, due to your poor record on community supervision, and the violence you exhibited during the instant offenses, your release at this time is denied. There is a reasonable probability you would not live and remain at liberty without violating the law.

*See* Respondent's Exhibit F.

The Wyoming County-Attica Legal Aid Bureau filed an administrative appeal from the denial of parole on Scott's behalf. *See* Respondent's Exhibit T. On appeal, Scott argued that the Parole Board failed to weigh all of the factors set forth of New York Executive Law § 259-i(5), and that its reliance on the seriousness of petitioner's convictions, rather than petitioner's

institutional achievements, led to an arbitrary and capricious determination. Respondent's Exhibit T, pp. 6-9. Petitioner also contended that the Parole Board failed to consider alleged inaccuracies in his record.

Petitioner sought further review of denial of parole via an Article 78 petition to the Supreme Court, Wyoming County, which was denied on May 8, 2002. The court found that in denying parole, the Parole Board had properly relied on the "serious and violent" conduct underlying petitioner's convictions, which had been committed while petitioner was on release to parole supervision, as well as his subsequent attempted escape from prison. Respondent's Exhibit G, pp. 1-2. The court further found that Parole Board acted within its discretion in assigning greater weight to these factors than to petitioner's positive programming and institutional record. *Id.*, p. 2. The court held that because petitioner failed to show that the Parole Board did not consider all of the relevant factors of New York Executive Law § 259-i(2)©, petitioner failed to show that the Parole Board's decision violated the law, was not supported by the record, and was tainted by "irrationality bordering on impropriety." *Id.*, p. 2. Also rejected was petitioner's claim that the Parole Board improperly relied on his arrest history, rather than his conviction history. The court explained that petitioner's objections to the content of the pre-sentence report should have been resolved in the sentencing court, and petitioner's only recourse was to bring the alleged errors in his commitment papers to the sentencing court's attention in a motion to vacate. *Id.*, pp. 2-3.

Petitioner indicates that he filed a Notice of Appeal with regard to the Wyoming Supreme Court's decision, but that his appeal to the Fourth Department was dismissed as moot in view of petitioner's reappearance before the Parole Board in 2003. Respondent's Exhibit S, ¶ 17.

On March 11, 2003, petitioner again appeared before the Parole Board for a hearing on his request to be released to parole. Respondent's Exhibit I. Petitioner informed the Board that he had made employment contacts and graduated from Skidmore College. *Id.*, pp. 2-4. However, he was unable to answer the commissioners' questions regarding why he had committed his crime. When asked if he had anything to say with regard to the murders/robberies conviction, petitioner stated, "I wish it had never happened." *Id.*, p. 4. Commissioner Smith noted that petitioner had been placed on probation and afforded youthful offender status in 1961, but violated the terms of that probation sentence. Petitioner was unable to recall why he was arrested in 1961 and thought that his first conviction that resulted in state time involved an automobile. *Id.*, pp. 5-6. As to why petitioner committed the instant offenses while on parole from a lengthy sentence, petitioner stated that he was "really influenced and trying to be a tough guy and all that kind of stuff," and he contended that his return to New York City had been the cause of his problems. *Id.*, p. 6.

On March 17, 2003, the Parole Board denied petitioner's request for release to parole, finding as follows:

> This panel has concluded that your release to supervision at this time is not compatible with the community safety and welfare and, therefore, parole is denied. This finding is made following a
> personal interview, record review and deliberation. Of significant concern is your lengthy history of crime that dates from a 1961 youthful offender adjudication and probation. The instant offenses of murder 2nd (two counts), robbery 1st (4 counts), attempted CPW 3rd and attempted escape 1st occurred while you were on parole and led to your third New York State prison term. Consideration has been given to your satisfactory behavior and programming. However, the probability you will live and remain at liberty without violating the law is not found to be reasonable given the factors noted above.

Respondent's Exhibit J.

With the assistance of counsel, petitioner appealed the Parole Board's denial of his request for release to parole supervision. In his brief, petitioner contended that the Board's action was arbitrary and capricious and a manifestation of an illegal policy, in that since 1995, Governor Pataki implemented a policy to grant parole less often to violent felons. Respondent's Exhibit K, pp. 3-4. Relatedly, in a letter dated October 1, 2003, the Executive Director of the Wyoming County-Attica Legal Aid Bureau, Inc., informed the Appeals Unit of the Parole Board that the Department of Correctional Services had corrected petitioner's database entry to reflect that his 1978 weapons possession was not a "violent felony offense," as petitioner's crime did not carry that statutory designation at the time petitioner pleaded guilty. Respondent's Exhibit L.

In February 2004, the Appeals Unit affirmed the Parole Board's determination, concluding that petitioner's claim that the denial of parole was arbitrary and capricious was not supported by the record, as there was no evidence that the Parole Board considered any non-statutory factors in rendering a decision. *See* Respondent's Exhibit M. The Appeals Unit also found that there was no indication that an error in classifying Scott's conviction-offenses prejudiced the Parole Board: "Where there is not a convincing showing that the Board relied upon erroneous information, there is no cause to disturb the decision." *Id.*

The 2003 parole denial was affirmed by the Fourth Department. *Scott v. Dennison*, 20 A.D.3d 946, 798 N.Y.S.2d 706 (App. Div. 4th Dept. 2005), and petitioner was denied leave to appeal this order to the New York Court of Appeals. *Scott v. Dennison*, 5 N.Y.3d 710, 803 N.Y.S.2d 31 (N.Y. 2005).

Petitioner appeared before the Parole Board again on November 1, 2005. *See* Respondent's Exhibit O. When Commissioner Mevec listed petitioner's present convictions,

petitioner corrected the number of first-degree robbery convictions from four to three. *Id.*, pp.

2-3. Although petitioner admitted to killing two guards, he contended, erroneously, that the

probation report account of the crimes reflected that petitioner's acts were intentional, and "there

is no intent in felony murder, there is no intentional act in felony murder; it was an actual

accident." *Id.*, pp. 4-5. The following colloquy occurred:

> Q.: Actual accident?
> A.: Yeah. The guard never ran out of the theater, he grabbed the gun and the gun went off.
> Q.: How about the other guy?
> A.: The other guy ran and he was shot at, he was not like directly shot at.
> Q.: Did you shoot him?
> A.: Yes.
> Q.: You shot at him and you hit him?
> A.: Yes.

*Id.*, p. 5. Petitioner admitted to possessing a gun a month after the murders/robberies, and that he

had pleaded guilty to the attempted escape charge. *Id.*, pp. 6-8. Commissioner Mevec noted that

petitioner had been "programming, certainly, appropriately," and had worked as a paralegal

assistant in the law library and taught a legal research class, and that petitioner was assisting

other facilities with their legal research programs. *Id.*, p. 9. Petitioner stated that he hoped to

work as a paralegal upon his release and that he had been accepted to Cardozo Law School in

and to Pace University. *Id.*, p. 11. On November 6, 2005, the Parole Board denied petitioner's

request for release to parole supervision in the following decision:

> Parole denied due to the seriousness of your crimes, murder 2nd, robbery 1st, attempted criminal possession weapon 3rd, and attempted escape 1st degrees [sic]. You were involved in the death of two victims during a robbery. You were on parole at the time of this crime. You have a lengthy criminal record with multiple felony convictions and violations of probation and parole. You have programmed well over the course of this bid. However, to hold otherwise would deprecate

the seriousness of your crime as to undermine respect for the law.

*See* Respondent's Exhibit P.

On November 26, 2005, petitioner filed a Notice of Appeal from the Board's determination, which indicated his belief that the Board's decision was "more likely then [sic] not that such erroneous and incorrect information previously contained in my institutional records, which prejudiced my previous Parole Board appearances (03/13/01 & 03/11/03), continues to be maintained in the files before the November 1, 2005 parole panel." Respondent's Exhibit Q. On December 5, 2005, the Parole Board acknowledged receipt of the Notice of Appeal and informed petitioner that his appeal had to be perfected by April 3, 2006. Respondent's Exhibit R. At the time he filed his petition, respondent notes, Scott had not yet perfected his appeal to the Appeals Unit.

In the instant habeas petition, Scott contends that (1) the Parole Board violated petitioner's due process rights by relying on the nature of his crimes and his criminal history; (2) the Parole Board violated petitioner's due process rights by relying on allegedly erroneous information; and (3) petitioner's right to equal protection of the laws was violated because he was erroneously considered a violent felony offender; the Parole Board denied parole on the basis of petitioner's crimes and his criminal history; and the Governor of New York allegedly promulgated a policy whereby all violent felony offenders are to be denied parole.

Respondent answered the petition, asserting the defense of non-exhaustion with regard to the claims involving the 2001 and 2005 parole denials and arguing that, in any event, none of Scott's claims had merit.

The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1).

For the reasons that follow, the Court concludes that neither the exhausted nor the unexhausted claims raised in Scott's petition warrant Federal habeas relief, regardless of the standard of review. Therefore, the petition is dismissed.

## II.     Standard of Review

Scott's petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and so the provisions of AEDPA govern this Court's disposition of his habeas claims. Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if

-11-

the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

## III.    "Exhaustion of State Remedies" Requirement

Under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "Exhaustion requires that the prisoner 'fairly present' the federal claim 'in each appropriate state court (including a state supreme court with powers of discretionary review.'" *Richardson v. Superintendent of Mid-Orange Correctional Facility*, No. 09-3655-pr, ___ F.3d ___, 2010 WL 3619781, at *3 (2d Cir. Sept. 20, 2010) (quoting *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citation omitted in *Richardson*)).

"Exhaustion requirements are fully applicable to habeas proceedings that challenge a denial of parole." *Desire v. New York State Div. of Parole*, No. 00 Civ. 5514, 2001 U.S. Dist. LEXIS 13784, *5 (S.D.N.Y. Aug. 22, 2001) (citing *Coady v. Vaughn*, 251 F.3d 480, 483, 488 (3d Cir. 2001)). To exhaust a denial of parole under New York law, a petitioner must first file an

administrative appeal with the Division of Parole's Appeals Unit. See Desire, at *6 (citing N.Y. COMP. CODES. R. & REGS. tit. 9, § 8006.1); *accord, e.g.*, *Morel v. Thomas*, No. 02 CV 9622(HB), 2003 WL 21488017, *2 n.3 (S.D.N.Y. June 26, 2003). If that appeal is denied, the prisoner must seek relief in state court via a writ of mandamus filed under Article 78 of the New York Civil Practice Law and Rules. *Morel*, 2003 WL 21488017, *2 n.3. "'If the Article 78 petition is denied, the [inmate] must appeal that denial to the "highest state court capable of reviewing it."'" *Tatta v. Miller*, No. 05-CV-1205 (FB)(MG), 2005 WL 2806236, at *2 (E.D.N.Y. Oct. 27, 2005) (quoting *Scales v. New York State Div. of Parole*, 396 F. Supp.2d 423, 428 (S.D.N.Y. 2005) (quoting *Cotto v. Herbert*, 331 F.3d 217, 237 (2d Cir.2003)).

Respondent asserts that Scott failed to exhaust his remedies with respect to the 2001 decision denying parole because he never perfected an appeal to the Appellate Division from the denial of his Article 78 petition in Supreme Court. In addition, respondent argues, Scott had not, at the time of filing his petition, exhausted his remedies with respect to the 2005 decision, because he had only filed a Notice of Appeal with the Division of Parole Appeals Unit. Respondent concedes that petitioner has exhausted his claims arising from the 2003 decision denying parole.

As respondent points out, a number of district courts in this Circuit have held that "in habeas corpus cases, potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit." *Brown v. Thomas*, 2003 U.S. Dist. LEXIS 3396, *2-3 (S.D.N.Y. March 10, 2003) (quoting ); *see also Boddie v. New York State Division of Parole*, 285 F. Supp. 2d 421, 428 (S.D.N.Y. 2003). Respondent urges that although petitioner has failed to exhaust his state

remedies with regard to the 2001 and 2005 denials, this Court may choose to reach the merits of petitioner's claims, pursuant to 28 U.S.C. § 2254(b)(2), in order to deny (but not grant) the petition, *see Travis v. New York State Div. of Parole*, 1998 U.S. Dist. LEXIS 23417, *10-11 (N.D.N.Y. Aug. 26, 1998).

There remains no specific guidance from the Second Circuit or the Supreme Court regarding the standard to be used determining whether an unexhausted claim should be dismissed on the merits under 28 U.S.C. § 2254(b)(2). *Jones v. Lape,* 2010 WL 3119514, *10 (N.D.N.Y. May 28, 2010) (citing *Hernandez v. Conway*, 485 F. Supp.2d 266, 273 n. 1 (W.D.N.Y.2007) (Bianchini, M.J.) (noting that a majority of the district courts have used a "patently frivolous"[1] standard, while others use a "non-meritorious"[2] standard, dismissing a claim when it is "perfectly clear that the [petitioner] does not raise even a colorable federal claim") (quotations and citations omitted). The Supreme Court's decision in *Rhines v. Weber*, 544 U.S. ___, 125 S. Ct. 1528, 161 L. Ed. 2d 440, 451 (2005), suggests another possible standard; in *Rhines*, the Supreme Court held even if petitioner has good cause for his failure to exhaust his claims first in state court, it would an abuse of discretion to grant a stay where the unexhausted claims are "plainly meritless."

Even assuming the claims were properly exhausted, all of Scott's claims fail under a

---

[1] The "patently frivolous" language appeared in *Jones v. Senkowski*, 2001 WL 1230800, at *4 (2d Cir. Oct.5, 2001), a decision that was later vacated and withdrawn. *Naranjo v. Filion*, 2003 WL 1900867, at *8 n. 14 (citing *Jones v. Senkowski*, 2002 WL 246451 (2d Cir. May 22, 2002) , *amended by Jones v. Senkowski*, 42 Fed.Appx. 485, 2002 WL 1032589 (2d Cir.2002), *cert. denied*, 537 U.S. 1177, 123 S.Ct. 1005, 154 L.Ed.2d 923 (2003) )

[2] In finding that a "non-meritorious" standard was more appropriate, one district court referenced retired Justice Steven's concurrence in the Supreme Court decision in *Duncan v. Walker*, 533 U.S. 167, 183 (2001), holding that federal habeas corpus petitions do not toll AEDPA's one-year statute of limitations. *See Basnight v. Keane*, No. 99-CV-5907, 2001 WL 901139, at *5 n. 1 (E.D.N.Y. July 31, 2001) (noting that in *Duncan*, Justice Stevens stated that "the AEDPA gives a district court the alternative of simply denying a petition containing unexhausted but nonmeritorious claims").

pre-AEDPA standard of review. Because they cannot pass muster under a pre-AEDPA standard, they necessarily cannot provide a basis for habeas relief under the more stringent, post-AEDPA standard of review. *See Messiah v. Duncan*, 435 F.3d 186, 197 (2d Cir.2006) ("We need not determine here whether Messiah's claims were adjudicated on the merits by the state courts, thereby triggering AEDPA review, because his claims would fail even if we apply the less deferential, pre-AEDPA standard.").

## IV. Analysis of the Petition

### A. Ground One: Petitioner was denied due process by the Parole Board.

It is well-settled that a prisoner is not entitled to the protections of due process merely because a state statutorily provides for the possibility of parole. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 10, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). "Any protected liberty interest must, therefore, have its origin in a state statutory scheme which creates an entitlement to parole." *Washington v. White*, 805 F. Supp. 191, 192 (S.D.N.Y. 1992) (citing *Greenholtz*, 442 U.S. at 11-12); *accord, e.g., Harris v. Travis*, No. 97-CV-3275 (JG) 1998 WL 812617, at *3 (E.D.N.Y. Mar. 24, 1998); *Quartararo v. Catterson*, 917 F.Supp. 919, 940 (E.D.N.Y. 1996); *Allen v. Steen*, 94-CV-0277E(H), 1995 WL 643846, at *4 (W.D.N.Y. Oct. 19, 1995).

The Second Circuit has determined that New York's parole scheme (N.Y. EXEC. LAW § 259-i and N.Y. COMP. CODE R. & REG. tit. 9, § 8001.3) does not create a due process liberty interest in parole. *See Boothe v. Hammock*, 605 F.2d 661, 664 (2d Cir. 1979); *accord Barna v. Travis*, 239 F.3d 169, 170 (2d Cir. 2001). Relying upon the methodology employed in *Greenholtz* and *Allen* of analyzing the language of the parole statute, the Second Circuit

compared the Nebraska and Montana statutes to Exec. Law § 259-i and found New York's law to be legally distinguishable. In *Boothe*, for example, Second Circuit opined that it was " apparent that New York's parole provisions . . . do not establish a scheme whereby parole *shall* be ordered *unless* specified conditions are found to exist." *Boothe*, 605 F.2d at 664 (emphases added); *accord Barna*, 239 F.3d at 171. Therefore, the Second Circuit ruled, the New York parole scheme as currently formulated in Exec. Law § 259-i "is not one that creates in any prisoner a legitimate expectancy of release," meaning that New York prisoners "have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable." *Barna*, 239 F.3d at 171; *see also id.* at 170 ("In order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have a legitimate expectancy of release that is grounded in the state's statutory scheme.") (citing, *inter alia*, *Greenholtz*, 442 U.S. at 11-13); *Carrion v. Smith*, No. 09-3717-pr, 365 Fed. Appx. 278, at *285, 2010 WL 457326, at **5 (2d Cir. Feb. 11, 2010) (summary order) ("Although Petitioner is *eligible* for release, the decision to actually grant him parole remains within the discretion of the Parole Board. Inmates in New York have no liberty interest in parole because under New York law there is no entitlement to release.") (citing *Barna*, 239 F.3d at 171) (emphasis in original)). *Accord*, *e.g.*, *Green v. McCall*, 822 F.2d 284, 290 (2d Cir. 1987) (noting that *Boothe v. Hammock*, 605 F.2d 66, "involved (1) prisoners who had had no release date set, (2) statutes that did not use the Nebraska "shall . . . unless" structure found persuasive in *Greenholtz*, and (3) decisions that were wholly discretionary"); *see also Washington v. White*, 805 F. Supp. 191, 192 (S.D.N.Y. 1992) ("Since New York's parole provisions do not create an entitlement to parole, *Boothe v. Hammock*, 605 F.2d 661, 664 (2d Cir.1979), any alleged unfairness in plaintiff's parole hearing does not and cannot afford a

predicate for relief under [Title 42 U.S.C.] Section 1983, *Russo v. New York State Board of Parole*, 50 N.Y.2d 69, 75, 427 N.Y.S.2d 982, 405 N.E.2d 225 (1980).").

The New York Court of Appeals had not considered whether New York's parole system gave rise to a protected liberty interest, prior to the Second Circuit's decision in *Boothe v. Hammock* interpreting Exec. Law § 259-i. Notably, the "Legislative Findings and Purpose which accompany the adoption of Executive Law Article 12-B (L.1977 ch. 904, s 1, eff. Jan. 1, 1978) provides that 'the exercise of discretion, which is inherent in the parole system, must be structured and administered consistent with notions of due process. . . .'" *Rogers v. Hammock*, 100 Misc.2d 280, 283, 418 N.Y.S.2d 835, 837 (N.Y. Sup. Ct. 1979). Shortly after *Boothe*, however, the New York Court of Appeals held,

> What the New York statute promises, simply put, is that guidelines shall be established and followed unless reasons are given for not following them. That guidelines are provided does not mean they cannot be deviated from or create an entitlement to release at any particular time; the system is thus discretionary and holds out no more than the possibility of parole. . . . [Exec. Law § 259-i] holds out no more than the possibility of parole and does not treat like situated persons differently. That being so, petitioner has demonstrated no protected liberty interest which would implicate the due process guarantee[.]

*Russo v. New York State Board of Parole*, 50 N.Y.2d at 76 (citing *Greenholtz*, 442 U.S. at 12; *Boothe*, 605 F.2d at 664; *Walker v. Oswald*, 449 F.2d 481, 485 (2d Cir. 1971)).

This Court is bound by the Second Circuit's case law holding that New York's current parole system, as embodied in Exec. Law § 259-i, does not give inmates a constitutionally protected liberty interest in parole release.

Assuming *arguendo* that there was a protected liberty interest embodied in Exec. Law § 259-i, the next considerations would be (1) what process is due to the prisoner in protecting that

interest, and (2) whether the Parole Board's actions concerning the parole release decision accorded him such process. *Greenholtz*, 442 U.S. at 16; *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) ("A liberty interest having been established [in avoiding "Supermax" confinement], we turn to the question of what process is due an inmate whom Ohio seeks to place in [that type of confinement].") (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (stating that the requirements of due process are "flexible and cal[l] for such procedural protections as the particular situation demands")).

In *Greenholtz*, the Nebraska statute at issue afforded a prisoner with a protected liberty interest in the possibility of parole-release, the Supreme Court held that the statute provided sufficient process to satisfy the prisoners' procedural due process rights:

> [W]e find nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular "evidence" in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release. The Board communicates the reason for its denial as a guide to the inmate for his future behavior. *See Franklin v. Shields*, 569 F.2d, at 800 (*en banc*). To require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole-release determination with a guilt determination. The Nebraska statute contemplates, and experience has shown, that the parole-release decision is, as we noted earlier, essentially an experienced prediction based on a host of variables. *See Dawson*, The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice, 1966 WASH. U. L. Q. 243, 299-300. . . . The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more.

*Greenholtz*, 442 U.S. at 15-16; *accord Green v. McCall*, 822 F.2d at 291 ("The *Greenholtz* Court did not purport to establish what procedures might or might not be required for the protection of even the very limited liberty interest at stake in *Greenholtz* . . . .").  The Supreme Court

specifically rejected the Nebraska inmates' argument that the Parole Board was required to "specify the particular 'evidence' in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release." 442 U.S. at 15.

Under New York's current statute and regulations regarding parole determinations, an inmate is entitled to the following process: an interview conducted by a panel of at least two members of the Board of Parole, *see* N.Y. COMP. CODE R. & REGS., tit. 9, § 8002.2(a), (b); and, if parole is denied, a written statement provided "within two weeks of his interview, of the factors and reasons in detail for such denial" and which specifies "[a] date for reconsideration [of parole]" "within 24 months" of the previous hearing, *see* N.Y. EXEC. LAW § 259-i(2)(a); N.Y. COMP. CODE R. & REGS., tit. 9, § 8002.3(d). Scott does not contend that he was denied these procedural protections in regard to any of his parole determinations. As noted above, the Supreme Court has held that where a statute *does* confer a liberty interest in parole, due process is satisfied simply by an opportunity to be heard and a statement of the reasons for denial of parole. *See Greenholtz*, 442 U.S. at 16 (stating the due process does not require more than the procedures provided by the Nebraska parole statute, namely, "an opportunity to be heard," and when parole is denied, to be "inform[ed] . . . in what respect he falls short of qualifying for parole"). Although lacking a due process liberty interest based upon New York State's and Second Circuit's interpretation of the New York parole scheme, Scott similarly was afforded those procedural protections deemed to be adequate in *Greenholtz*: He had an opportunity to be heard and to present evidence at his interviews before the Parole Board panels; the Parole Board has issued written, statements of denial, giving statutorily recognized reasons for its decision.

Furthermore, there is an appellate review process available to New York inmates

challenging parole denials. In Scott's case, at least with regard to the 2003 denial, he took full advantage of that process; accordingly, the Parole Board's determination was reviewed and affirmed by an administrative appeals board, and that determination was reviewed in an Article 78 proceeding in New York State Supreme Court. *Accord, e.g.*, *Tatta v. Miller*, No. 05-CV-1205 (FB)(MG), 2005 WL 2806236, *3 (E.D.N.Y. Oct. 27, 2005); *see also Schwartz v. Dennison*, 518 F. Supp.2d 560, 573 (S.D.N.Y. 2007) (in a proceeding pursuant to 42 U.S.C. § 1983, district court rejected procedural due process claims by inmate denied parole under Correction Law § 805, "confirm[ing] what was stated in *Greenholtz*: an opportunity to be heard and a statement of the reasons for denial of parole 'affords [all] the process that is due' where a parole statute creates a protected liberty interest"); *Blackett v. Thomas*, No. 02 Civ.9258 RMB FM, 2003 WL 21744080, at *3 (S.D.N.Y. July 14, 2003) ("The New York parole system meets these minimal [due process] requirements [as stated in *Greenholtz*].").

It bears emphasizing that in cases where courts *have found* a protected liberty interest in parole, such as *Greenholtz*, all that is required by the Federal Constitution are certain procedures; the Constitution does *not* require a particular outcome as a result of the process. *Accord, e.g.*, *Tatta v. Miller*, 2005 WL 2806236, at *3 (E.D.N.Y. Oct. 27, 2005) ("Moreover, regardless of whether New York's parole scheme gives rise to a legitimate expectation of release, the denial of Tatta's application for parole comported with procedural due process, which, in this context, requires only that the inmate be given an opportunity to be heard and informed of the reasons for the denial of parole. *See Greenholtz*, 442 U.S. at 16. Tatta received both a hearing and the reasons for the denial of parole.") (internal parenthetical omitted); *Morel v. Thomas*, No. 02 CV 9622(HB), 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003) ("However, even if Morel is

correct that the New York parole scheme, like the Nebraska statute, creates a liberty interest, he overlooks the fact that New York's scheme contains procedures similar to Nebraska's to minimize the risk of erroneous decisions, which the [Supreme] Court found met due process requirements.") (citing *Greenholtz*, 442 U.S. at 16) (parenthetical omitted)).

Scott's quarrel is with the New York State courts' application of New York State law concerning the point at which judicial intervention in the workings of the Parole Board is warranted. *See Gittens v. Thomas*, No. 02 Civ. 9435(JSM), 2003 WL 21277151, *2 (S.D.N.Y. May 20, 2003) ("Petitioner's claims that the [Parole] Board did not properly apply state law does not present a federal question. '[I]t is not the province of a federal habeas court to reexamine . . . determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.' *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)."). In this Court's opinion, Scott does have a colorable claim under New York *State* law, although even State authorities are in conflict on the issue as to whether the New York's statutory scheme precludes the Parole Board from relying exclusively on the nature of the inmate's crime to deny parole. *Compare Thurman v. Hodge*s, 292 A.D.2d 872, 739 N.Y.S.2d 324 (App. Div. 4ᵗʰ Dept. 2002) (consideration of the serious and violent nature of petitioner's crimes comports with New York statutory parole scheme); *Charlemagne v. New York Div. of Parole*, 281 A.D.2d 669, 670, 722 N.Y.S.2d 74, 75 (App. Div. 3d Dept. 2001) (Parole Board not required to give equal weight to each factor in parole decision); *Garcia v. New York State Div. of Parole*, 239 A.D.2d 235, 239, 657 N.Y.S.2d 415, 418 (App. Div. 1ˢᵗ Dept. 1997) ("However, while the relevant statutory factors must be considered, it is well settled that the weight to be accorded to each of the factors lies

solely within the discretion of the Parole Board (*see*, *Klein v. New York State Division of Parole*, 202 A.D.2d 319, 320, 609 N.Y.S.2d 208; *Matter of McKee v. New York State Board of Parole*, 157 A.D.2d 944, 945, 550 N.Y.S.2d 204; *People ex rel. Herbert v. New York State Board of Parole*, 97 A.D.2d 128, 133, 468 N.Y.S.2d 881). Moreover, the Board is not required to expressly discuss each of the guidelines in its determination (*Matter of King*, . . ., 83 N.Y.2d at 791, 610 N.Y.S.2d 954, 632 N.E.2d 1277).”); *Farid v. Travis*, 239 A.D.2d 629, 629, 657 N.Y.S.2d 221, 221-22 (App. Div. 3d Dept. 1997); *King v. New York State Div. of Parole*, 598 N.Y.S.2d 245, 251 (App. Div. 1st Dept. 1993); *with Weinstein v. Dennison*, (“Nor was it appropriate for the Board to focus solely on the 14 year old crime. Petitioner was properly sentenced by a court, upon the recommendation of the district attorney and in keeping with the sentencing parameters set forth by the legislature. The sentencing court decided an indeterminate term of imprisonment of 7 to 21 years was appropriate, and the district attorney made clear at the plea proceedings that its office believed the 7 year minimum sufficient in petitioner's case. The seriousness of the crime, of course, may be considered by the Board, but the 'conviction per se should not preclude parole, there must be a showing of some aggravating circumstances beyond the inherent seriousness of the crime itself.'”) (quoting *King*, supra at 433, 598 N.Y.S.2d 245 and citing *Phillips v. Travis*,6 Misc.3d 1041(A), 800 N.Y.S.2d 354 (Table), 2005 WL 701116 (N.Y. Sup. Ct. Mar. 8, 2005) (granting Article 78 petitioner's application to annul respondent's determination denying petitioner parole, and remanding the matter for a re-hearing before a Parole Board comprised of different commissioners), *rev'd*, 21 A.D.3d 335, 800 N.Y.S.2d 397, 398 (App. Div. 3d Dept. 2005) (“Contrary to the finding of the motion court, respondent complied with the statutory mandate to consider certain guidelines in determining whether to

release an inmate on parole. The Parole Board is not required to delineate in its decision each of the guidelines considered. The record reflects that petitioner was afforded a proper hearing in which only the relevant guidelines were considered. Where, as here, the sentencing court, and not the Board of Parole, has set the minimum sentence of imprisonment, those guidelines include the seriousness of the offense and the inmate's prior criminal record. Given the heinousness of petitioner's crime, the Board's denial of parole was neither arbitrary nor capricious.") (internal citations omitted); *Cappiello v. New York State Bd. of Parole*, 800 N.Y.S.2d 343 (Table), 2004 WL 3112629, at *7 (N.Y. Sup. Ct. Nov. 30, 2004) (granting inmate's Article 78 petition for reconsideration of parole denial on basis that the Board failed to take into account factors other than petitioner's "threat to public safety")); *Wallman v. Travis*, 794 N.Y.S.2d 381, 388 (App. Div. 1st Dept. 2005) ("[A]s the sole . . . basis for the [Parole] Board's denial was the seriousness of the offense, [the parole denial] was irrational bordering on impropriety.").

The district courts in this Circuit to have considered the issue have found that since New York's parole statute does not specify how much weight to be accorded to each factor, the "law does not forbid the Board from deciding that the seriousness of an offense and a prisoner's institutional record outweigh [other criteria]." *Salahuddin v. Unger*, No. 04 CV 2180(JG), 2005 WL 2122594, at *6 (E.D.N.Y. Sept. 2, 2005); *see also Anthony v. New York State Div. of Parole*, No. 06 Civ. 180, 2006 WL 3859215, at * (S.D.N.Y. Jan. 4, 2006) (finding that New York law "allows the denial of parole based solely on the severity of the offense so long as there is 'a showing of some aggravating circumstances beyond the inherent seriousness of the crime itself'"), *Davis v. Thomas*, 256 F. Supp.2d 190, 192 (S.D.N.Y. 2003); *Manley v. Thomas*, 255 F. Supp.2d 263, 266-67 (S.D.N.Y. 2003); *Brown v. Thomas*, No. 02 Civ. 9257(GEL), 2003 WL

941940, at *2 (S.D.N.Y. Mar. 10, 2003) (stating that "the [Parole] Board was fully entitled to

determine that the nature of the crime outweighed the positive aspects of [petitioner's] record");

*Defino v. Thomas*, No. 02 Civ. 7413(RWS), 2003 WL 40502, at *4 (S.D.N.Y. Jan. 2, 2003)

(finding petitioner's due process claim unlikely to succeed when the Parole Board looked to "the

severity of [Petitioner's] offense" and petitioner's "'positive programming and community

support'" and found that "the former outweighed the latter"); *Walters v. Ross*, No. CV-92-2290,

1992 WL 398307 at *3-4 (E.D.N.Y. Dec. 21, 1992) (denial of parole based on the severity of the

prisoner's crime and his refusal to accept responsibility did not violate due process). At the end

of the day, however, this Court's disagreement with a State court on a matter of State law is not a

sufficient basis upon which to grant habeas relief.

**B.      Ground Two: The Parole Board violated petitioner's due process rights by
         relying on allegedly erroneous information.**

Scott asserts that the Parole Board relied upon erroneous information in his institutional

records. For instance, with regard to the 2001 parole denial, Scott states that on March 8, 2001,

he received a "'Parole Summary Memorandum . . . which contained official representations that

Petitioner was convicted . . . of two counts of felony-murder and four counts of robbery first

degree as a *violent felony offender* . . . ." Application for Issuance of Habeas Corpus, p. 5, ¶12

(Docket No. 1) (emphasis in original). Petitioner asserts that his attempts to have the alleged

mischaracterizations and erroneous factual statements corrected were ignored, and the

uncorrected Parole Summary Memorandum was submitted, along with his objections, to the

2001 Parole Board. *See id.*  Additionally, Scott complains, the record erroneously lists four

first-degree robbery convictions rather than three first-degree robbery and one attempted

first-degree robbery convictions; there was no female victim robbed during the Amsterdam Theater incident; and the Parole Board erroneously characterized petitioner's crimes as "in-concert"; and the record incorrectly describes petitioner's weapons-possession and escape offenses as "instant" rather than completed. *See* Respondent's Exhibit S, ¶¶83-86. Respondent argues that the alleged errors "either amount to hair-splitting or are insignificant." Resp't Mem. at 19.

Notwithstanding its decision in *Barna v. Travis*, the Second Circuit has held that an inmate denied parole, who alleged that the Parole Board improperly failed to consider sixteen years of missing prison records and a presentence investigations report, in contravention of N.Y. Exec. Law § 259-i and 9 N.Y. Comp. Reg. & R., tit. 9, § 8001.3(a), might be able to state a due process claim for purposes of maintaining a civil rights suit under 42 U.S.C. § 1983. *Rodriguez v. Greenfield*, No. 99-0058, 7 Fed. Appx 42, *45, 2001 WL 290503, at **3 (2d Cir. Mar. 23, 2001). The Second Circuit in *Rodriguez* cited favorably to *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991),[3] in which an Alabama inmate alleged that parole board improperly relied upon materially false information in his file. The Second Circuit found it significant that a New York State

---

[3]     In *Monroe*, the issue was that the Alabama state parole board knowingly relied upon materially false information in the prisoner's file in making its parole decision. 932 F.2d at 1442. The Eleventh Circuit, which had previously disclaimed a due process liberty interest in parole under Alabama law because the relevant Alabama parole statute was framed in discretionary terms, nevertheless found that the parole board's discretion was not unlimited. In particular, the Eleventh Circuit stated, the parole board was not allowed to engage in "flagrant or unauthorized action" or administer the parole system "maliciously or in bad faith," thereby causing the parole system to "become[ ] constitutionally offensive . . . ." *Monroe*, 932 F.2d at 1441-42. It bears noting that the Eleventh Circuit, before it examined the substance of the parole board's decision in *Monroe v. Thigpen*, first found that the prisoner had at least a *limited* liberty interest. In other words, although it found that the Alabama parole statute did not create a general liberty interest in the possibility of release to parole, it did "create[ ] an expectancy of a parole determination without reliance on false information." *Gordon*, 592 F. Supp.2d at 653 n.56 (citing *Monroe*, 932 F.2d at 1442 (citing *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982)). In light of this limited interest, the Eleventh Circuit held that the parole board had acted "arbitrarily and capriciously in violation of due process" by relying upon demonstrably false information in prisoner Monroe's file in making its determination to deny parole. *Id.* at 1442.

Supreme Court had invalidated one of Rodriguez's parole denials after finding that the Parole Board had engaged in "unauthorized activities by making parole determinations absent a complete record[.]" *Rodriguez*, 7 Fed.Appx. at *45, 2001 WL 290503, at **2.

The *Rodriguez* panel acknowledged the Circuit's earlier holding in *Barna v. Travis*, that no liberty interest exists in New York State's parole scheme because the statute is purely discretionary and does not create a legitimate expectancy of release. 7 Fed.Appx. at *44, 2001 WL 290503, at **2. The Second Circuit distinguished *Barna* and found that it did not answer the question before it in *Rodriguez*, namely, whether a New York state prisoner has a liberty or property interest in having the Parole Board comply with its own statutory and regulatory guidelines in determining whether to grant or deny parole. In Rodriguez's particular case, the issue was whether Rodriguez had a due process right to have the Parole Board make its parole decisions after reviewing the missing prison records and presentence investigation report in conformance with the procedures explicitly dictated by state statute in N.Y. EXEC. LAW § 259-i and N.Y. COMP. REG. & R., tit. 9, § 8001.3(a). The discretionary nature of New York's parole statute did not foreclose Rodriguez from stating a cause of action because, the Second Circuit reasoned, the Parole Board could not possibly have exercised its discretion to consider the relevant parole-suitability factors in Exec. Law § 259-i where it did not have information concerning those factors for at least sixteen of the thirty years in which plaintiff had been incarcerated. *Rodriguez*, 7 Fed.Appx. 42, at *44-45, 2001 WL 290503, at **2. Noting that the particular due process issue raised by Rodriguez with respect to parole decisions based upon missing records was an unsettled question, the Second Circuit therefore vacated the dismissal of plaintiff's § 1983 claim concerning the parole denial and remanded it to the district court for

further briefing. *Id.* There are no further reported or unreported decisions in this matter–either by the district court or the Second Circuit.

The Court reads *Rodriguez* as providing support for the proposition that even in the absence of a general liberty interest in parole-release, "flagrant or unauthorized action," *Monroe*, 932 F.2d at 1441 (quotation omitted), by a Parole Board can "become[ ] constitutionally offensive[,]" *id.* (cited with approval in *Rodriguez*, 7 Fed.Appx. at *45, 2001 WL 290503, at **2. However, even assuming that such a limited liberty interest exists, the Court cannot grant habeas relief here. As an initial matter, the Court has found no clearly established Supreme Court precedent standing for the limited liberty interest described in the Eleventh Circuit's decision in *Monroe*, a pre-AEDPA habeas case, and the Second Circuit's unpublished disposition in *Rodriguez*. Under AEDPA, this Court only can grant relief where the state court's resolution of the merits of a petitioner's claim is contrary to, or an unreasonable application of, clearly established precedent of the *Supreme Court*, not circuit court precedent. Furthermore, the Parole Boards who considered Scott's case did not engage in the kind of "flagrant or unauthorized action" described in *Monroe v. Thigpen*. To the contrary, the Court agrees with respondent that to the extent there were errors in Scott's records, they were inconsequential and had no effect on the Parole Board's ultimate decisions to deny parole.

First, the Court addresses Scott's argument regarding the designation of his convictions as "violent felony offenses." Respondent explains that at the time Scott was convicted, the robberies and weapon-possession charges were not designated as "violent felony offenses." However, in 1980, the New York Legislature amended the Penal Law to describe the attempted third degree criminal possession of a weapon charge and attempted first degree robbery charge of which Scott

was convicted as "violent felony offenses." *See People v. Morse*, 62 N.Y.2d 205, 215 (N.Y. 1984) ("Attempted criminal possession of a weapon in the third degree was classified as a violent felony by 1980 amendment to section 70.02 of the Penal Law (L.1980, ch. 233, § 2, eff. Aug. 12, 1980)."); *People v. Aiello*, 93 A.D.2d 864, 864, 461 N.Y.S.2d 370, 371 (App. Div. 1st Dept. 1983) (" New York's violent felony laws, which became effective as of September 1, 1978 (L.1978, ch. 481, § 67), reclassified certain existing offenses as 'violent felonies' and enhanced the penalties upon conviction of those offenses. The crime of attempted robbery in the first degree is now classified as a violent felony offense (Penal Law, § 70.02, subd. 1, par. (b)) although at the time of defendant's prior conviction it was classified only as a felony."); *see also People v. Baker*, 112 Misc.2d 496, 498, 447 N.Y.S.2d 223, 225 (N.Y. Sup. Ct. 1982).

The Respondent explains during the computerization of New York State Department of Correctional Services' ("NYSDOCS") record-keeping system in the 1980s, the convictions in question were automatically, but erroneously, labeled "violent felony offenses", presumably as a result of the recent amendments to the Penal Law. However, this error was corrected in October 2003. Respondent's Exhibit S, ¶¶41-42. The 2001 and 2003 Parole Boards thus did view an uncorrected record, but the 2005 Parole Board reviewed accurate records. Scott concedes that the errors were corrected in his Application for a Writ of Habeas Corpus, ¶¶41-43, pp. 13-14 (Docket No. 1). Although Scott is correct regarding the erroneous designations, the Court agrees with respondent that his complaint elevates form over substance: The conduct underlying the robberies committed by Scott was no less violent simply because they were committed before the New York Legislature amended the Penal Law to characterize the offenses as "violent." A review of the Parole Board's decision certainly reflects that it considered the nature of the

conduct exhibited by petitioner during the robberies and attempted robbery, which included two fatal shootings; it is not reasonable to suppose that the Parole Board's decision in 2001 or 2003 would have been different "but for" the label affixed to the offenses. Neither the Parole Board's interview with petitioner or its decision focused on the fact that the prisoner database reflected, in 2001 and 2003, petitioner's crimes were "violent felony offenses" as that term is used in the Penal Law for purposes of qualifying a defendant as a recidivist felony offender.

Scott's second allegation concerning errors in his institutional record concerns the 2001 Parole Board's reference to his having committed "four counts of robbery first degree as a violent felony offender." Although Scott was originally indicted and convicted of four counts of robbery, and on appeal, the Appellate Division reduced one robbery conviction to attempted robbery. The modification of this one conviction apparently has led to the confusion. In any event, this argument, too, elevates form over substance given the seriousness of the conduct underlying the entire criminal incident in which Scott was involved. There is no indication that the Parole Board's decision depended on whether Scott committed three "completed" robberies and one "attempted" robbery versus four "completed" robberies. The fact that Scott fatally shot two individuals during the robberies and attempted robbery overshadows that distinction.

Scott's third claim of error is that his record contains a notation that a "female" was when, in fact, there were no female robbery victim during the theater incident. Assuming there was such an error, it likely stems from the fact that one victim's name was Virginio Moreira, and someone misread it as Virginia. *See* Exhibit T, Petitioner's Memorandum dated March 8, 2001. As respondent points out, this does not change the fact that petitioner forcibly stole this individual's watch. This alleged error cannot reasonably have influenced the Parole Board's

decision.

Fourth, petitioner contends that Parole Board's erroneously characterized his crimes as "in-concert". This, however, is legally baseless. Given the underlying facts as described above, Scott and his cohorts clearly were acting "in concert" when they formed and executed the plan to rob the theater of its payroll, during which they held the employees hostage.

Fifth, and last, petitioner points to an alleged mischaracterization regarding the length of his sentences for the escape and weapons-possession convictions. Although Scott's sentences for these convictions were only 1 ½ to 3 years each, because he also was concurrently sentenced to longer terms of incarceration, his lesser sentences will not be deemed satisfied until he serves his controlling sentence–which is an indeterminate term of 25 years to life. This is apparently an administrative aspect of sentence calculation for all inmates, and cannot be said to have affected the Parole Board's evaluation of Scott's case.

Taken singly or together, these alleged errors did not influence the Parole Board's decision; in other words, the Court cannot discern in the record evidence that the Parole Board denied parole on the basis that Scott's convictions were erroneously designated as "violent felony offenses" or because petitioner's fourth robbery was not "completed" or out of concern that one of the victim's was a woman or that his 1½ to 3 year prison sentences were considered to be outstanding while he was still serving his controlling sentence. *See Boddie*, 285 F. Supp. 2d at 428-29 ("Boddie was not denied parole for arbitrary or impermissible reasons when the Parole Board rendered its decision without having received a corrected Pre-Sentence Report or Inmate Status Report"; the state court properly found that "[t]he minor change made in petitioner's pre-sentence report [was] not a basis for overturning the denial of parole" and "[t]he fact that the

Board's decision incorrectly state[d] that '[Boddie] and [his] co-defendant pointed a shotgun at the victim,' [was] also insufficient to reverse the Board's decision" because "New York law holds that parole decisions that accord with applicable statutory requirements will not be overturned judicially absent a showing that the parole denial exhibits "irrationality bordering on impropriety") (quotations omitted). Instead, the Parole Board's questioning and decisions reflect a concern that Scott had not fully internalized culpability for the two murders he committed, given that he characterized them as "accidents" and apparently has not displayed what the Parole Board considers to be genuine remorse. Also, the Parole Board focused on Scott's lengthy criminal history and his return, while on parole supervision previously, to engaging in criminal activity. The Court appreciates Scott's concern that the Parole Board improperly weighted these static factors–i.e, the nature of the crime, and his criminal history–in denying parole. However, as discussed above, that contention is not within the purview of a Federal district court sitting in habeas.

In sum, the Court agrees with respondent that the record does not support Scott's claim that the Parole Board denied his requests for release to parole supervision on the basis of the foregoing alleged errors. The contentions advanced by Scott in this regard do not state a due process violation.

### C. Ground Three: Petitioner's rights under the Equal Protection Clause were violated by Parole Board.

Scott contends that the Parole Board's denials of parole violated his rights under the Equal Protection Clause because (1) his crime was improperly characterized as a violent felony offense; (2) then-Governor Pataki's administration promulgated a blanket policy of denying parole to all violent felons; and (3) the Parole Board considered petitioner's criminal and social

history and the severity of his crimes.

The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). "Unless a classification trammels fundamental personal rights or is drawn upon inherent suspect distinctions such as race, religion, or alienage," the courts must presume that the distinctions made are constitutional as long as they are "rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assoc. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2000) (citing *LeClair v. Saunders*, 627 F.2d 606, 608-10 (2d Cir. 1980)). In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (*per curiam*), the Supreme Court affirmed the validity of such "class of one" claims "where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564. To prevail on a "class of one" equal-protection claim, plaintiff must "show, not only 'irrational and wholly arbitrary' acts, but also intentional disparate treatment." *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir.2001) (quoting *Olech*, 528 U.S. at 564).

Scott appears to contend that his equal protection rights derive from membership in a suspect class, i.e., violent felony offenders. Courts in this Circuit have held that "merely being a prisoner is insufficient to place [one] in a suspect class." *Defino*, 2003 WL 40502, at *4 n.4

(citing *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997) (stating that "neither prisoners nor indigents are a suspect class"); *Carbonell v. Acrish*, 154 F. Supp.2d 552, 561 (S.D.N.Y. 2001) ("The parties agree, and the Court holds, that because prisoners are not a suspect class and the PLRA's attorneys' fee restrictions do not violate any fundamental right, the PLRA fee cap provisions are judged under the rational basis review standard.")). To succeed on an equal-protection claim, petitioner must first show that "violent felony offenders are similarly situated to non-violent felony offenders, a proposition which . . . has been soundly rejected by the courts." *Farid v. Bouey*, 554 F. Supp.2d 301, 322 (N.D.N.Y.2008) (citing *Standley v. Dennison*, No. 9:05-CV-1033 (GLS/GHL), 2007 WL 2406909, at *13 (N.D.N.Y. Aug. 21, 2007) ("[S]everal courts have specifically held that, for purposes of an equal protection analysis, (1) violent felony offenders are not actually "similarly situated" to non-violent offenders, and (2) in any event, discrimination against violent felony offenders in terms of parole release is 'entirely appropriate.'") (quoting *Bottom v. Pataki*, No. 03-CV-0835, 2006 WL 2265408, at *6-7 & n. 5 (N.D.N.Y. Aug.7, 2006) and citing *Larocco v. N.Y.S. Div. of Parole*, No. 05-CV-1602, 2006 WL 1313341, at *3 (N.D.N.Y. May 12, 2006); *Borcsok v. Pataki*, No. 05-CV-1542, 2006 WL 839545, at *2, n. 2 (N.D.N.Y. Mar. 29, 2006); *Parks v. Edwards*, No. 03-CV-5588, 2004 WL 377658, *4 (E.D.N.Y. Mar.1, 2004)).

Furthermore, Scott's equal protection claim does not warrant a heightened level of scrutiny because neither violent felons nor non-violent felons are a "suspect class" under the United States Constitution. *E.g.*, *Mathie v. Dennison*, No. 06 Civ. 3184(GEL), 2007 WL 2351072, at *8 (S.D.N.Y. Aug. 16, 2007) ("Prisoners are not a suspect class, *Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir.1996), and plaintiff does not claim that a fundamental

personal right is implicated in the denial of parole."); *Standley*, 2007 WL 2406909, at *13. As the

district court in *Mathie* explained, "[a] history of violent crime is the very opposite of a morally

irrelevant, immutable trait: it reflects a voluntary choice by the offender to commit a dangerous

and harmful criminal act when he could have complied with the law. Thus, disparate treatment

by the state in granting parole to violent and nonviolent prisoners is presumed constitutional and

need only be rationally related to a legitimate state interest." *Mathie*, 2007 WL 2351072, at

*8; *see also Farid*, 554 F. Supp.2d at 322 (" More significantly, as many courts have recognized,

distinguishing between these two groups [i.e., violent and non-violent felons], for purposes of

parole determinations, is 'entirely appropriate and not at all invidious.'") (quoting *Parks v.

Edwards*, No. 03-CV-5588, 2004 WL 377658, at *4 (E.D.N.Y. Mar. 1, 2004); and citing

*Standley*, 2007 WL 2406909, at *13). In Salahuddin, at *20-21, the habeas court rejected the

petitioner's claim that the state's disparate treatment of violent and nonviolent offenders violated

his right to Equal Protection under the Fourteenth Amendment. *Salahuddin* explained that

prisoners are not a suspect class, and the petitioner did not claim that a fundamental right was

implicated in the denial of parole. Thus, disparate treatment is presumed constitutional and need

only have a rational basis; here, the prevention of early release of potentially violent inmates. Id.,

at *21 (citations omitted).

To the extent that Scott's equal protection claim can be interpreted as being based on his

comprising a "class of one," *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), it is "in

tension" with Scott's claim regarding the alleged policy to deny parole to those convicted of

violent felony offenses. *See Mathie v. Dennison*, 2007 WL 2351072, at *9. Regardless, it cannot

provide a basis for habeas relief. "To state a valid equal protection 'class of one' claim, a plaintiff

must allege (1) that he has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment." *Mathie*, 2007 WL 2351072, at *9 (citing *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003)). Scott's "class of one" claim fails because he has not carried his burden of demonstrating that he has been intentionally singled out for different treatment as compared to other, similarly situated, New York inmates seeking parole.

The Court turns next to Scott's claim that the Parole Board impermissibly applied an across-the-board policy of denying parole to inmates based on their offense of conviction. In *Harris v. Travis*, No. 98-2344, 175 F.3d 1007, 1999 WL 96125, at *1 (2d Cir. Feb. 18, 1999) (unpublished disposition), the Second Circuit affirmed the district court's rejection of an equal protection claim brought by a New York inmate denied parole. As Scott does here, plaintiff Harris had argued that, "as a group, violent felons have been subjected to selective treatment by the Parole Board" and that the Parole Board had decided not to release entire classes of offenders such as sex offenders or inmates with other serious violent felony offenses; Harris alleged a pattern of the Parole Board excluding otherwise eligible inmates from parole. *Harris v. Travis*, No. 97-CV-3275 (JG), 1998 WL 812617, at *3 (E.D.N.Y. Mar. 24, 1998), *aff'd* No. 98-2344, 175 F.3d 1007, 1999 WL 96125, at *1 (2d Cir. Feb. 18, 1999) (unpublished disposition). The district court in *Harris* dismissed plaintiff's equal protection claim, finding that "[v]iolent felons being considered for parole release are not similarly situated with nonviolent felons being considered for parole release" because "the Executive Law allows the Parole Board to consider the seriousness of an inmate's offense and an inmate's prior criminal record in cases, such as this one, where the board has not previously fixed a minimum period of imprisonment." *Id.* Noting

that the provision question might operate to deny parole to violent felony offenders more often than non-violent felony offenders, the district court concluded that was "in accordance with the discretionary power of the Parole Board and does not constitute a basis for an equal protection claim." *Id.* (citation omitted). On appeal, the Second Circuit affirmed the dismissal of plaintiff's equal protection claim "because there [was] no allegation that [Harris] was denied parole based on a suspect classification, and because there [was] a rational basis, i.e., safety of the community, for permitting the parole board to consider the nature of the underlying offense when making parole eligibility determinations." *Harris*, 1999 WL 96125, at *1 (citing *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("If a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.") (citing *Heller v. Doe*, 509 U.S. 312, 319-320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993)).

First, as in *Harris*, petitioner Scott is not a member of a suspect class; stated another way, violent felons are not considered a "suspect class." Second, the overwhelming weight of authority in this Circuit is that any alleged disparate treatment of violent felons by the Parole Board has a rational basis, that is, the prevention of the release of potentially violent felons into the community. *E.g.*, *Harris*, 175 F.3d 1007; *Howithi v. Travis*, No. 06 Civ. 3162(BSJ)(MHD), 2008 WL 7728648, *13 (S.D.N.Y. Sept. 16, 2008) ("[D]iscrimination against violent felony offenders in terms of parole release is 'entirely appropriate and not at all invidious' and thus is rationally related to a legitimate government interest."), *report and recommendation adopted*, No. 06CIV.3162(BSJ)(MHD), 2010 WL 1685412 (S.D.N.Y. Apr. 23, 2010) (quoting *Standley*, 2007 WL 2406909, at *13; and citing *McLaurin v. Paterson*, No. 07 Civ 3482(PAC)(FM), 2008

WL 3402304, at *15 (S.D.N.Y. Aug. 11, 2008) ("The state clearly has a rational basis for drawing a distinction in parole determinations between persistent offenders and non-persistent offenders, which is to prevent the early release of potentially violent inmates or those who are more likely to recidivate.") (quoting *Salahuddin v. Unger*, 2005 WL 2122594, at *7); *Seltzer v. Thomas*, No. 03 Civ.00931 LTS FM, 2003 WL 21744084, at *4 (S.D.N.Y. July 29, 2003)). I see no distinction between Scott's case and those cited above. Accordingly, I conclude that Scott cannot state a denial of equal protection by the Parole Board, and this claim must be dismissed. *E.g.*, *Mathie*, 2007 WL 2351072, at *8;  *Salahuddin*, 2005 WL 2122594, at *7.

## IV.    Conclusion

For the reasons set forth above, the petition for a writ of habeas corpus filed by petitioner Ralph Scott is **denied**. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, no certificate of appealability shall issue with respect to any of petitioner's claims.

**IT IS SO ORDERED.**

/s/ Victor E.Bianchini

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:        September 23, 2010
              Buffalo, New York.